Patrick J. Picariello, J.
Petitioner is a co-operative limited profit project (Mitchell-Lama) housing corporation and has instituted 36 holdover proceedings predicated upon its election to terminate respondents’ occupancy agreements upon the latters’ failure to comply with the rule in said agreements contained prohibiting the maintenance of pets in their apartments.
Respondents’ answers, by stipulation, admit all the allegations required for petitioner’s proof of a prima facie case.
The court is cognizant of the coup de grace administered by our appellate courts to the nub of this bitterly contested controversy which had been raging between landlords and tenants. *334 Pronouncements that a prohibition against the harboring of animals by residents of apartment houses is reasonable and enforceable and that its breach may be made the basis for a termination of tenancy at the election of the landlord appeared to have finally resolved this controversy for all times. This court acknowledges that stability and certainty in the law require adherence to precedents by courts of original jurisdiction, and that decisions of our Court of Appeals must be followed by all lower courts.
This controversy, however, is still the subject of many and varied judicial opinions and the object of juridical debates notwithstanding the cul-de-sac thought to have been reached by these pronouncements.
However, as one very eminent jurist observed a few decades ago, no case has an identical twin.
The following undisputed facts, probably peculiar to these proceedings, raise the question as to whether petitioner, by its conduct and its action, is not thereby estopped from invoking this prohibition.
Petitioner’s sales office on the site was opened in early 1967. It was supervised by its renting agent, a Mr. Locascio, who had 13 or 14 sales people working under' his direct control, interviewing applicants for apartments and accepting their applications. He had received instructions from his immediate supervisor that it was a fixed rule — no deviation — that no pets were to be allowed in the apartments. He testified that he imparted these instructions to his sales people. He could not testify, whether or not this prohibition was communicated to the applicants by any of these sales people with whom the applicants had sole and direct contact. He did testify however that on a few occasions he was asked for additional information by some sales clerk. On these occasions, the query by the applicant was invariably addressed to the harboring of dogs, and when he was directly asked the question as to what would happen if an applicant brought in a pet he replied, “ You are taking a chance, you might be evicted ’ ’. This equivocal answer was given to those few applicants who inquired despite his instructions from his superior and his alleged instructions to his sales people, supra. A doubt is thus created under the circumstances whether any others of the applicants, except for the few who were referred to the manager by the sales clerk, had been informed of this prohibition. The fact that the applicants denied receiving the information from the sales people, in the *335 absence of any rebuttal testimony, persuades the court to a finding that they were not made aware of this prohibition until many, many months later.
There were between 8,000 and 9,000 applications accepted for 1,648 apartments. It was the practice for a prospective tenant to visit the sales office on the site and to procure an application for an apartment. After the application was brought back, properly filled in, and with a deposit, the prospective tenant was assigned an apartment. He was told to return within two to three weeks (after a credit report had been obtained) with the balance of the equity payment at which time a subscription agreement was signed by the applicant. All of these documents were then forwarded to the appropriate State department for approval. A very short time thereafter, and after the application had been approved by the housing company and the Division of Housing and Community Renewal of the State of New York, the applicant was notified that the purchase of the apartment was completed. The applicant thus became the owner of an apartment and nothing yet had been told him about the subject prohibition. In fact, this witness testified that if the applicant did not ask, he was not told.
Mr. Belacco, sales agent, who had been, and still is, employed by the petitioner handling resales, with 10 years of such experience in Mitchell-Lama programs, and who testified that 66 No animals in any Mitchell-Lama program are permitted”, testified that, “ If a person did not make a specific inquiry concerning what the policy was with respect to dogs, no information with respect thereto was given.”
The first apartment was sold in early 1967. In fact, all of the apartments were sold before Mr. Locaseio exited the scene in late 1968. This witness never saw the occupancy agreement which was the first and only document to contain the written prohibition. In fact, they were not available before March or April of 1970. The first apartment became ready for occupancy in November or December of 1970. The applicant was invited to petitioner’s office two or three weeks before the apartment was ready for occupancy at which time he was asked to sign the occupancy agreement. It was then for the first time, that is, if he read the agreement and the rules, that the applicant became aware that he had purchased an apartment the use of which was subject to this prohibition. Of course, argues the petitioner, having then and there been made aware of the prohibition (whether or not he read the occupancy agreement) the *336 purchaser of the apartment was under no compulsion to sign it if he did not like it. This court will not attempt either to dignify this argument by an answer or clothe it with rectitude under the circumstances herein.
The question in this court’s mind is whether or not, under the circumstances surrounding this controversy, there was not a duty upon the petitioner’s experienced and well-informed agents to inform the applicants of this prohibition at the time they filed their applications and to admonish them of the consequences a breach would visit upon them. Both the manager and sales agent had knowledge of the prohibition and the requirement for strict adherence thereto (no deviation) even before the first application was accepted. Was there not a duty upon them to speak forthwith at that time and not to equivocate; to reveal and not remain silent under the circumstances of this then and still touchy and raging controversy 1
It has been said that a person may be precluded by his act or conduct or silence, when it is his duty to speak, from asserting a right which he otherwise would have had.
The court is in agreement with petitioner’s argument that on this record it may not make a finding of fraudulent intent; however, an estoppel may arise even where there is no intent to mislead, for careless and culpable conduct is equivalent to intent to deceive. The court is also impressed with petitioner’s argument that on this record it may not make a finding of actual fraud; however, actual fraud is not an essential element of estoppel, but estoppel arises when omission to speak is an actual or constructive fraud, and it may also arise although there may be no designed fraud.
It is this court’s opinion that petitioner may not now avail itself of the admitted breach of the subject prohibition under the circumstances of these proceedings.
It is the court’s belief that the respondents were entitled to notice of the prohibition at the time they first filed their applications, especially in view of the fact that the housing market was then, and is now still, tight “ and the compulsion of the times puts the tenant on an unequal and sometimes desperate footing.”
And further, it cannot be said that respondents sustained no prejudice and that they could not have taken any protective action had they been advised at anytime before their applications had been approved that they would not be permitted to harbor pets. They would at least have had the opportunity *337 to refuse to purchase the apartment under said condition. Moreover, and under such circumstances, they would not have had to put up all the equity and thereby deprive themselves of its use and interest (Exhibit G attached to the stipulation provides, ‘ ‘ Should you decide for any reason to withdraw or cancel, there can be no refund until your apartment is resold and a new applicant is approved and signs a new subscription agreement. When your apartment has been resold, your equity payment will be refunded, less $50.00 to cover costs ”); wait three years for the completion of the project (during which time they had opportunity to look elsewhere); make arrangements with their landlords to terminate their tenancy; purchase new furniture; make arrangements for moving; etc., etc.
The court is of the opinion that petitioner’s conduct inhibits the invocation of the subject prohibition to effect a termination of tenancy and a consequent forfeiture of these valuable leaseholds.
This decision is not to be considered as giving carte blanche to any tenant to acquire and harbor a dog in his apartment. It is intended that these respondents (first tenants) and any other tenant similarly situated (the petitioner having indicated the institution of holdover proceedings against other tenants predicated upon the same prohibition) be permitted to keep their present dogs until they die or are otherwise destroyed (a canine life estate, so to speak).
Petitions dismissed, with costs.